***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser. The appealing party has shown good grounds to reconsider the evidence. The Full Commission affirms in part and reverses in part the opinion of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. AIG Claims Service was the carrier on the risk on September 18, 2000 and December 7, 2000.
3. On September 18, 2000, plaintiff sustained an admittedly compensable injury by accident to her back when she fell into a cart while working for defendant-employer. This claim is the subject of I.C. No. 119945.
4. Plaintiff contends that on or about December 7, 2000, she contracted an occupational disease related to her employment with defendant-employer to both of her hands and arms. This claim is the subject of I.C. No. 126344. Defendants have denied this claim.
5. At all relevant times herein, an employer-employee relationship existed between plaintiff-employee and defendant-employer.
6. Pursuant to the submitted Industrial Commission Form 22 plaintiff's average weekly wage for the claim which is the subject of I.C. No. 119945 was $875.07 yielding a compensation rate of $583.41.
7. Plaintiff's average weekly wage for the claim which is the subject of I.C. No. 126344 was to be determined by an accurate wage chart, Commission Form 22, or other payroll documents prepared and submitted by defendants.
8. At the hearing before the Deputy Commissioner, the parties stipulated to and submitted the following exhibits:
Pretrial Agreement
Plaintiff's medical records
Plaintiff's employment and wage earning records
Industrial Commission forms for both claims
9. The issues before the Commission are whether plaintiff's current disability to her back is related to her compensable injury of September 18, 2000, and, if so, to what disability benefits and medical treatment is she entitled. Plaintiff did not appeal the denial of her claim for an occupational disease to her hands as a result of her employment with defendant-employer.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty-six years of age, born June 4, 1945. Plaintiff did not complete high school, but did obtain her GED. Prior to beginning her employment with defendant-employer in 1996, plaintiff had some work experience in the textile industry. Plaintiff also independently operated her own child care center for approximately seven years.
2. Prior to the incidents giving rise to the claims currently before the Commission, plaintiff experienced several other injuries to her back. In 1987, plaintiff injured her back while working for a different employer when she attempted to lift a heavy box of yarn. Plaintiff ultimately underwent surgery at the L5-S1 level, and was out of work for approximately four months thereafter.
3. On August 28, 1998, while working for defendant-employer on the extrusion line, plaintiff stepped off a stool, twisting her ankle and injuring her back. Plaintiff received treatment for this incident from Dr. Frank Rowan, an orthopedic surgeon. An October 12, 1998 MRI ordered by Dr. Rowan revealed a mild diffuse bulge of the intervertebral disc without herniation at the L1-L2 level, moderate to severe spinal stenosis, a diffuse bulge at the L4-5 level, and post-surgical changes at the L5-S1 level from the 1987 injury. Because the back pain plaintiff was experiencing was increasing, plaintiff was referred to Dr. Robert Nudelman, a neurosurgeon, who first examined her on November 24, 1998. A myelogram and CT scan revealed post surgical changes on the right at the L5-S1 level and a small recurrent disc herniation on the right at the L5-S1 level. The diagnostic studies also showed spinal stenosis at the L4-L5 level. Dr. Nudelman felt that it was possible that some of plaintiff's symptoms were related to the recurrent lumbar disc herniation at the L5-S1 level, but also advised plaintiff that all of her back problems might not be coming from this area. Although Dr. Nudelman suggested surgery, he advised plaintiff that even if surgery were successful, it was possible that she would experience ongoing future problems as a result of her degenerative disc disease and post-surgical changes. On February 8, 1999, plaintiff underwent a laminectomy and microdiscectomy at the L5-S1 level performed by Dr. Nudelman. Following this procedure, plaintiff's condition improved, and she returned to work with restrictions on May 3, 1999.
4. On May 18, 1999, plaintiff sustained another back injury as she was pulling down the line while working for defendant-employer. For this injury, plaintiff initially received treatment from Dr. Joseph Guarino, who specializes in the treatment of occupational injuries and is defendant-employer's designated physician. Dr. Guarino examined plaintiff on May 21, 1999, and diagnosed back pain with radiculopathy. Plaintiff was released to return to work with restrictions of no lifting greater than ten pounds, no forceful pushing or pulling, no bending or stooping, no working longer than eight hours and with instructions to alternate sitting and standing.
5. Plaintiff returned to work in May of 1999 and worked through September 18, 2000 without missing work due to her back condition, but continued to treat with Dr. Nudelman and Dr. Guarino.
6. On June 4, 1999, plaintiff returned to Dr. Nudelman and reported increased back pain following what was described as an aggravation of her back condition. Dr. Nudelman ordered another MRI, which was performed on June 30, 1999, and which revealed post surgical changes at the L5-S1 level on the right, advanced lower lumbar arthropathy, and mild annular bulging at the L4-L5 level. Based upon these findings, Dr. Nudelman discussed with plaintiff the possibility of fusion surgery at the L5-S1 level and prescribed pain medication.
7. In December 1999, plaintiff was involved in a work related injury when she was pushing a buggy onto a scale and experienced pain in her stomach. Plaintiff was diagnosed with a hernia which was treated surgically. Approximately four months following the hernia surgery, plaintiff returned to light duty work for defendant-employer in the rework area performing inspections. Several months later, plaintiff returned to her regular position on the extrusion line.
8. Subsequent to sustaining this hernia, on January 11, 2000, plaintiff was examined by Dr. Nudelman with complaints of continued upper back, neck and shoulder pain. Dr. Nudelman concluded that these symptoms were related to either the degenerative conditions in plaintiff's back, which pre-dated both the 1998 and 1999 back injuries, or post-surgical changes at the L5-S1 level. Additionally, Dr. Nudelman was of the opinion that plaintiff had reached maximum medical improvement regarding her back and assigned a ten percent permanent partial disability rating. At his deposition, Dr. Nudelman testified that given plaintiff's chronic condition, he expected her to experience continued problems with neck, upper back and shoulder pain, as well as low back pain radiating into her lower extremities even after he released her in January 2000. However, from January 11, 2000 until the compensable injury by accident on September 18, 2000, plaintiff received no medical treatment for her back condition.
9. Prior to the compensable injury by accident, plaintiff regularly worked twelve-hour shifts, four days a week, plus overtime.
10. On September 18, 2000, while working on the extrusion line, plaintiff stepped back and fell a short distance into a buggy which had been placed behind her, injuring her back. This claim was accepted as compensable by defendants through an Industrial Commission Form 60 and is the subject of I.C. No. 119945. On October 20, 2000, plaintiff was examined by Dr. Guarino with symptoms of back pain shooting down into her right lower extremity. Dr. Guarino diagnosed plaintiff with lower back pain with radiculopathy. Plaintiff's previous complaints had been of upper back pain, but following the September 18, 2000 injury by accident, plaintiff reported for the first time low back pain that radiated down her leg.
11. Dr. Guarino prescribed medications and assigned additional work restrictions of working no more than an eight-hour shift, no lifting greater than fifteen pounds, no forceful pushing or pulling, and no bending or stooping. In compliance with the Dr. Guarino's new restrictions, plaintiff upon her return to work was reassigned from the extrusion line to the rework area where she inspected parts for defects and worked fewer hours per week than before her injury and no overtime. Due to the new work restrictions, plaintiff's wage earning capacity was diminished and defendants paid her temporary partial disability compensation beginning October 20, 2000.
12. The part inspection position consisted primarily of visually inspecting parts. Although plaintiff used some tools, any use of her hands involved varied, different movements throughout the day to assist her in this process. The parts plaintiff inspected weighed between one-half and four pounds, and she was allowed to work at her own pace given that this was not a production job. During her shift, plaintiff also operated a forklift used to discard scrap and was able to take breaks as needed.
13. Due to plaintiff's continued back pain, Dr. Guarino ordered an MRI which was performed on November 10, 2000. The results of this MRI revealed no new injury, but rather reflected an aggravation of her preexisting degenerative problems. The results from this November 2000 MRI were essentially unchanged from the MRI performed on June 30, 1999. Accordingly, Dr. Guarino concluded that plaintiff's ongoing back problems were not related to her September 18, 2000 admittedly compensable injury.
14. Dr. Guarino referred plaintiff for physical therapy. Following this therapy, on November 30, 2000, plaintiff was released to return to work and continued the same restrictions previously given plaintiff.
15. Based upon the findings made by Dr. Guarino after the November 2000 MRI, defendants ceased payments of temporary partial disability compensation. The last payment of compensation for the September 18, 2000 compensable injury was made on December 8, 2000.
16. On December 7, 2000 plaintiff returned to Dr. Guarino with complaints of neck and shoulder problems, accompanied by numbness and tingling in the upper extremities. Dr. Guarino was of the opinion that plaintiff's neck and shoulder pain were likely the result of carpal tunnel syndrome, which he felt was most likely related to her diabetes and not to any workplace injury. With his tentative diagnosis of carpal tunnel syndrome, Dr. Guarino provided plaintiff with wrist splints and released her to return to light duty work with the additional restriction of no forceful or repetitive use of the upper extremity.
17. Eventually, a neurometrix study was performed and confirmed that plaintiff had carpal tunnel syndrome. Dr. Guarino referred plaintiff to Dr. Elizabeth Meyerdierks, a neurosurgeon. Dr. Guarino could not causally relate plaintiff's carpal tunnel syndrome to the September 18, 2000 incident, or to her employment with defendant-employer. Additionally, Dr. Guarino felt that plaintiff's employment with defendant-employer did not place her at an increased risk of developing carpal tunnel syndrome as compared to members of the general public not so employed.
18. On March 6, 2001, Dr. Meyerdierks examined plaintiff and diagnosed her with bilateral carpal tunnel syndrome. Dr. Meyerdierks was unable to give an opinion as to the cause of plaintiff's carpal tunnel syndrome or whether plaintiff's employment with defendant-employer placed plaintiff at an increased risk of developing carpal tunnel syndrome as compared to members of the general public not so employed. Although Dr. Meyerdierks initially requested nerve conduction studies, she has since indicated that these studies were not necessary because plaintiff was unwilling to have surgery for her carpal tunnel syndrome.
19. Plaintiff contends that her carpal tunnel syndrome was caused by repetitive motions in the performance of her work with defendant-employer. However, the credible evidence of record does not support a finding that plaintiff's duties for defendant-employer in any position in which she worked were sufficiently repetitive to have caused or significantly contributed to the development of her carpal tunnel syndrome. Furthermore, the medical evidence does not support a finding that plaintiff's employment with defendant-employer exposed her to an increased risk of developing this disease.
20. Plaintiff continued to experience back pain and on March 19, 2001 plaintiff requested that Dr. Guarino refer her to Dr. Nudelman for treatment. Because plaintiff advised Dr. Guarino that she did not intend to have surgery, he advised that he could not justify referring her to a surgeon. However, Dr. Guarino did refer plaintiff to Dr. Randy Kritzer, a specialist in micro-neurosurgery. Dr. Guarino concluded on March 19, 2001 that plaintiff was able to work with similar restrictions previously assigned to her due to her degenerative back condition. Dr. Guarino also provided restrictions of no forceful or repetitive use of her upper extremities and no reaching or overhead work due to her carpal tunnel syndrome.
21. On May 1, 2001, plaintiff was examined by Dr. Kritzer, who reviewed the MRI films and recommended a myelogram for a more definitive diagnosis. However, plaintiff declined the myelogram due to her concerns over complications she had experienced during a prior myelogram in 1998.
22. Plaintiff was seen by Dr. Nudelman on October 19, 2001, at which time she reported continued pain in her lower back radiating into her right leg. This was the first time Dr. Nudelman had seen plaintiff since prior to the September 18, 2000 incident.
23. Regarding plaintiff's carpal tunnel syndrome, Dr. Nudelman was unable to state the cause of plaintiff's carpal tunnel syndrome. Dr. Nudelman offered no testimony regarding any increased risk of contracting carpal tunnel syndrome due to plaintiff's job duties.
24. Based upon the nature of plaintiff's injury by accident, the findings on both MRI's, and plaintiff's description of her symptoms, Dr. Nudelman stated, and the Commission finds, that plaintiff's current back condition and radiculopathy arose from the compensable injury by accident on September 18, 2000. As the result of the compensable injury by accident, the work restrictions imposed by Dr. Guarino in October 2000 remained appropriate for plaintiff in October 2001 and the compensable injury by accident was a contributing factor in Dr. Nudelman's recommendation concerning the work restrictions. Therefore, plaintiff's diminished wage earning capacity after October 20, 2000 was causally related to the compensable injury by accident.
25. As of October 19, 2001 plaintiff was at maximum medical improvement and retained an additional five percent permanent functional impairment to her back as a result of the compensable injury by accident.
26. The Full Commission accepts as credible and gives greater weight to the causation opinions of Dr. Nudelman and also to his opinion that plaintiff's September 18, 2000 injury by accident was a significant contributing factor in the imposition of plaintiff's subsequent work restrictions and limitations. Dr. Nudelman is a board-certified neurosurgeon, performed plaintiff's earlier back surgeries, and had an opportunity to see plaintiff's condition before and after the September 18, 2000 injury by accident.
27. The condition of plaintiff's back subsequent to September 18, 2000 was caused or aggravated by the September 18, 2000 compensable injury by accident.
28. As of the date of the Deputy Commissioner hearing, plaintiff continued to work a diminished hours for defendant-employer on the inspection line in a position suitable to her restrictions, and that job is not make-work.
29. This matter was defended upon reasonable grounds by defendants.
 ***********
Based upon the forgoing findings of fact and stipulations, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's employment with defendant-employer did not cause or significantly contribute to the development of her carpal tunnel syndrome. N.C. Gen. Stat. § 97-53(13). Furthermore, plaintiff's employment with defendant-employer did not expose her to an increased risk of contracting this disease. Id.
2. On September 18, 2000, plaintiff sustained an admittedly compensable injury by accident to her back arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. §97-2(6).
3. As a result of plaintiff's compensable injury, plaintiff was partially disabled and is entitled to receive partial disability compensation at the rate of two-thirds of the difference between her average weekly wage and any wages earned beginning October 20, 2000 and continuing for 300 weeks from the September 18, 2000 date of injury, or until plaintiff returns to work earning wages equal to her preinjury wages. N.C. Gen. Stat. § 97-30. Defendants are entitled to a credit for partial disability compensation already paid to plaintiff.
4. As the result of the compensable injury by accident, plaintiff is entitled to permanent partial disability compensation at the rate of $583.41 per week for fifteen weeks for the additional five percent permanent disability to her back. N.C. Gen. Stat. § 97-31(23).
5. Plaintiff is entitled to elect the more munificent remedy between N.C. Gen. Stat. § 97-30 and § 97-31. McLean v. Eaton Corp.,125 N.C. App. 391, 481 S.E.2d 289 (1997).
6. Plaintiff is entitled to have defendants provide all medical treatment arising out of plaintiff's compensable injury to the extent it tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
7. Because this matter was defended upon reasonable grounds by defendants, plaintiff is not entitled to an award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a credit for partial disability compensation already paid, defendants shall pay to plaintiff partial disability compensation at the rate of two-thirds of the difference between her average weekly wage and any wages earned beginning October 20, 2000 and continuing for 300 weeks from the September 18, 2000 date of injury or until she returns to work earning her pre-injury wages. The portions of this amount which have accrued shall be paid in a lump sum, subject to a reasonable attorney's fee approved below.
2. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is hereby approved for plaintiff's counsel. The attorney's fee shall be paid as follows: twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, defendants shall pay every fourth compensation check directly to plaintiff's counsel.
Defendants shall bear the costs.
This the ___ day of January 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER LKM/kjd